**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**SOUTHERN DIVISION**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| CHERYL LEWIS, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. _____ |
| AB & I FOUNDRY, TYLER PIPE COMPANY, MCWANE, INC., CHARLOTTE PIPE AND FOUNDRY COMPANY, RANDOLPH HOLDING COMPANY, and CAST IRON SOIL PIPE INSTITUTE, INC., | ) ) ) ) ) ) | CLASS ACTION

JURY TRIAL DEMANDED |
| Defendants. | ) | |

---

## CLASS ACTION COMPLAINT

---

**NOW INTO COURT** comes the Plaintiff, Cheryl Lewis ("Plaintiff"), on behalf of herself and all others similarly situated (the "Class" as defined below), upon personal knowledge as to the facts pertaining to herself and upon information and belief as to all other matters, based on the investigation of counsel, brings this class action for damages, injunctive relief, and all other necessary and appropriate relief pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d), and the Tennessee Trade Practices Act, Tenn. Code Ann. § 47-25-101 et seq., and alleges as follows:

# I. NATURE OF ACTION

1.      Plaintiff, a Tennessee resident who purchased Cast Iron Soil Pipe ("CISP") indirectly from at least one Defendant not for resale, brings this proposed class action against Defendants AB&I Foundry, Tyler Pipe Company and McWane, Inc. (together, "McWane"), and Defendants Charlotte Pipe and Foundry Company and Randolph Holding Company LLC (together, "Charlotte Pipe") (collectively, "Manufacturer Defendants"), and Cast Iron Soil Pipe Institute, Inc. ("CISP Institute") (collectively, the "Defendants"), for engaging in a long-running agreement, contract, conspiracy, arrangement, trust, or combination to unlawfully fix, artificially raise, maintain and/or stabilize prices for CISP sold indirectly to Plaintiff and other Class members.

2.      Under Tennessee's antitrust laws, Plaintiff brings this action on behalf of all persons and entities who purchased CISP or fittings in the United States indirectly from any of the Defendants, their subsidiaries, predecessors, or affiliates, during the period from at least January 1, 2006 through such time as the anti-competitive effects of Defendants' conduct ceased (the "Class Period").

3.      Defendants' agreement, contract, conspiracy, arrangement, trust, or combination is in violation of the Tennessee Trade Practices Act, Tenn. Code Ann. § 47-25-101 et seq. (the "TTPA").  As a result of Defendants' unlawful conduct, Plaintiff and the other Class members (defined below) have paid artificially-inflated prices for CISP and thus suffered injury of the type the TTPA is designed to prevent.

4.      Since at least 2006, the Manufacturer Defendants and their predecessors have been

the primary sellers and manufacturers of CISP in the United States. Together, McWane and Charlotte Pipe control over 90% of the market for CISP.

5.    Beginning at least as early as 2006, Defendants entered into a conspiracy to fix, raise, maintain and stabilize the prices of CISP sold in Tennessee and elsewhere. The Manufacturer Defendants engaged in various collusive acts, including agreements on CISP price levels, and agreements not to compete with each other at particular customer accounts, in order to facilitate price increases and further the goals of their unlawful conspiracy.

6.    The Manufacturer Defendants were able to effectuate this conspiracy easily, as they constitute the only members of a trade association, Defendant and Tennessee-based Cast Iron Soil Pipe Institute ("CISP Institute"), and thus, had numerous opportunities to communicate and collude at CISP Institute events and meetings, as well as other industry functions. The Tennessee-based CISP Institute facilitated communications and information-sharing among the Manufacturer Defendants about prices, customers, and confidential, commercially-sensitive information.

7.    Following these conspiratorial discussions at CISP Institute meetings, the Manufacturer Defendants would announce identical price increases, typically in the autumn to be effective in January.

8.    In 2007, Star Pipe Products, Ltd. ("Star Pipe") entered the CISP market and began to compete with Charlotte Pipe and McWane for a share of the CISP market. Star Pipe's entrance in the market threatened the Manufacturer Defendants' supra-competitive pricing and increased competition in the market.

9.    In July 2010, Charlotte Pipe, through its subsidiary Randolph Holding Company,

purchased the CISP assets of Star Pipe, further effectuating the supra-competitive price-fixing scheme being implemented by Defendants.[1] The purchase agreement included non-compete and confidentiality clauses for many of Star's top CISP executives.

10. Following the purchase, Charlotte Pipe destroyed Star Pipe's CISP assets and shuttered its CISP foundries. Charlotte Pipe previously had engaged in similar conduct to eliminate actual and potential competitors, and to maintain and further Defendants' implementation of their price-fixing conspiracy by purchasing smaller competitors in the CISP market only to sell off their assets and close their operations.

11. The effect of Charlotte Pipe's purchase of Star Pipe's CISP business was to lessen competition in the CISP market and to pave the way for Charlotte Pipe and McWane to continue to fix and set prices.

12. The United States Federal Trade Commission ("FTC") launched an investigation into Charlotte Pipe's acquisition of Star Pipe's CISP business, resulting in the FTC's filing of an administrative complaint April 2, 2013 against Charlotte Pipe. Subsequently, Charlotte Pipe entered into a Consent Agreement prohibiting it from engaging in certain anti-competitive activities.

13. Due to the Defendants' conspiracy and actions to keep the Manufacturer Defendants' competitors out of the CISP market, prices for CISP have increased steadily since at least 2006, despite declining demand in the United States. As a direct result of the anti-competitive and unlawful conduct alleged herein, Plaintiff and Class members paid artificially-inflated prices for

---

[1]Plaintiff also alleges that Charlotte Pipe's 2010 acquisition and liquidation of Star Pipe CISP business, which resulted in substantially decreased competition in the market for CISP, was an illegal acquisition, undertaken to facilitate and ensure the success of the price-fixing conspiracy herein alleged.

-4-

CISP manufactured by the Manufacturer Defendants during the Class Period and have thereby suffered antitrust injury to their business or property.

14.     Defendants' conduct alleged herein has lessened or tended to lessen open and free competition and led to artificially-inflated prices for CISP. Because the Manufacturer Defendants were competitors operating at the same level in the CISP distribution chain, their actions constitute a horizontal anti-competitive arrangement, a *per se* violation of the Tennessee Trade Practices Act, Tenn. Code Ann. § 47-25-101 et seq.

## II.   JURISDICTION AND VENUE

15.     This Court has diversity subject-matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, which amends 28 U.S.C. §1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of a class of Plaintiff is a citizen of a State different from any defendant" and the aggregated amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs. This Court also has jurisdiction under 28 U.S.C. §1332(d) because "one or more members of the class is a citizen of a state within the U.S. and one or more of the defendants is a citizen or subject of a foreign state."

16.     Venue exists in this Court under 15 U.S.C. §22 and 28 U.S.C. §1391 because Defendants reside; transact business; are found within; or have agents in this District and a substantial part of the events giving rise to Plaintiff's claims arose in this District.

17.     This Court has in personam jurisdiction over the Defendants because Defendants, either directly or through the ownership and/or control of their subsidiaries, inter alia: (a) transacted business in Tennessee and every United States jurisdiction, including in this District; (b) directly or indirectly sold or marketed substantial quantities of CISP in every United States jurisdiction,

including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; or (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business in Tennessee or the United States, including in this District. Defendants conduct business in Tennessee and the United States, including in this District, and have purposefully availed themselves of the laws of Tennessee and the United States..

### III.  PARTIES

18.     Plaintiff is a Tennessee resident who purchased CISP indirectly from one or more Defendants during the Class Period.

19.     Defendant AB&I Foundry ("AB&I") is a division of McWane, Inc., with its principal place of business located at 7825 San Leandro Street, Oakland, California 94621. AB&I was acquired by McWane, Inc. in late 2006, and since that time AB&I has been a division of and controlled by McWane, Inc.

20.     Defendant McWane, Inc. is a Delaware corporation with its principal place of business located at 1201 Vanderbilt Road, Birmingham, Alabama 35234.

21.     Defendant Tyler Pipe Company ("Tyler Pipe") is a division of McWane, Inc., with its principal place of business located at 11910 County Road 492, Tyler, Texas 75706. At all relevant times, Tyler Pipe has been a division of and owned and controlled by McWane, Inc.

22.     Defendant Charlotte Pipe and Foundry Company is a North Carolina corporation with its principal place of business located at 2109 Randolph Road, Charlotte, NC 28207.

-6-

23.     Defendant Randolph Holding Company, LLC is a wholly-owned subsidiary of Charlotte Pipe and is a limited liability company organized, existing, and doing business under and by virtue of the laws of the State of Delaware with its principal place of business located at 2109 Randolph Road, Charlotte, NC 28207.

24.     During the period of the arrangement alleged in this Complaint, Defendant Cast Iron Soil Pipe Institute, Inc., had its principal place of business in Hixson, Tennessee, within the Eastern District of Tennessee.  Its registered agent for service of process is CT Corporation System, Ste. 2021, 800 S. Gay Street, Knoxville, Tennessee 37929-9710.

## IV.   AGENTS AND CO-CONSPIRATORS

25.     The acts of Defendants alleged in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

26.     Various persons or firms not named as Defendants have participated as coconspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.

## V.   DEFENDANTS' CONDUCT HAS SUBSTANTIALLY AFFECTED TENNESSEE TRADE AND COMMERCE

27.     On behalf of proposed Class members in every Class Jurisdiction, *i.e.*, both residents and non-residents of Tennessee, Plaintiff brings this proposed class action for damages and equitable and other relief against Defendants for Defendants' anti-competitive conduct in violation of the Tennessee Trade Practices Act, Tenn. Code Ann. § 47-25-101 et seq.  Specifically, Plaintiff brings this action pursuant to *California v. ARC Am. Corp.*, 490 U.S. 93, 103 (1989) and *Freeman Industries, LLC v. Eastman Chemical Co.*, 172 S.W.3d 512, 519-20 (Tenn. 2005).  *ARC America*

-7-

provides that states may grant a remedy to indirect purchasers under their own antitrust laws. Under *Freeman Industries*, "indirect purchasers," including those who are not residents of Tennessee, may nevertheless recover under the Tennessee Trade Practices Act, Tenn. Code Ann. § 47-25-106, as "the real" and "ultimate victims" of antitrust violations – ***so long as there has been a substantial effect on Tennessee trade and commerce***.

28.     By reason of the unlawful activities hereinafter alleged, Defendants' arrangement substantially affected trade and commerce in the State of Tennessee.

29.     Defendants' agreement, contract, arrangement, trust, combination or conspiracy was substantially aided and effectuated by Manufacturer Defendants' long-standing involvement and association with the industry trade association, Defendant Cast Iron Soil Pipe Institute ("CISP Institute"). Throughout its sixty-four (64)-year history, the CISP Institute has been located in the Eastern District of Tennessee, most recently located at 3008 Preston Station Drive in Hixson, Tennessee 37343.

30.     The CISP Institute was organized in 1949 by twenty-four (24) manufacturers of CISP who met to identify the need to standardize product design, to distribute product information, and for continuing education. Today, the membership of the CISP Institute includes only the three Defendants and other entities owned and controlled by them. The Manufacturer Defendants are the CISP Institute's sole source of funding, and exert tight control over it.

31.     The only members of the CISP Institute are the Manufacturer Defendants or entities directly affiliated with them: AB&I Foundry, located in Oakland, California; AB&I Service Center,

located in City of Industry, California; Charlotte Pipe & Foundry, located in Charlotte, North Carolina; Tyler Coupling, located in Marshfield, Missouri; Tyler Pipe, located in Tyler, Texas; and Tyer Pipe Service Center, located in Macungie, Pennsylvania.

32.     The CISP Institute sponsored the industry's reference handbook (the "CISP Handbook"), which provided, and continues to provide, the industry's standard specifications for cast iron soil pipe, fittings, and accessories.  The CISP Handbook was compiled and edited by the Technical Advisory Group of the CISP Institute.

33.     The CISP Institute announces on its website (http://www.cispi.org) that:

> "[t]hrough the preparation and distribution of technical reports, we seek to advance interest in the manufacture, use and distribution of cast iron soil pipe and fittings, and through a program of research and the cooperative effort of soil pipe manufacturers, we strive to improve the industry's products, achieve standardization of cast iron soil pipe and fittings, and provide a continuous program of product testing, evaluation and development.  Since the founding of the Institute, member firms have standardized soil pipe and fittings, and have introduced a number of new products."

34.     To be assured that pipe fittings "meet the approved standards" of the CISP Institute, pipe fittings manufactured by the Manufacturer Defendants must bear is either the Ç® or the CI NO-HUB® trademarks, the "collective marks" all member companies may place on their products.

35.     The CISP Institute's Quality Control Program, created in the early 1960's, also "ensures that domestic manufacturers," *i.e.*, the Manufacturer Defendants, "are  manufacturing in compliance with the standards.  CISP Institute technicians make three annual unannounced inspections of the Manufacturer Defendants' inventories "to check dimensional accuracy, metallurgical data and record keeping requirements."

36.     The CISP Institute's website and marketing materials are used extensively to promote and market to suppliers, contractors, and the general public the CISP products manufactured by the Manufacturer Defendants.  For instance, the website states:

> ■ "Metallic shielded couplings for use in joining hubless pipe and fittings are also available in these size ranges from the member companies of the Cast Iron Soil Pipe Institute;"

> ■ "Thermoset elastomeric gaskets, lubricant, and assembly tools are available from the member companies of the Cast Iron Soil Pipe Institute;"

> ■ "[A]dditional fittings not found in the standards may be available. Don't give up until you have checked with the manufacturers.  Email The Institute if you need help, or contact a specific foundry directly;" and

> ■ "CISPI 310 - This standard covers stainless steel shielded couplings with a rubber (ASTM C564) gasket sleeve.  These couplings are the most widely used, and have been produced since the early 1960's. We estimate that 1 ½ billion have now been installed. These couplings are produced by numerous manufacturers and are sold by all of the cast iron soil pipe and fittings manufacturers."

37.     And while the CISP Institute markets the Manufacturer Defendants' products, the CISP Institute is also marketed by the Manufacturer Defendants.  For instance, the website of Defendant Charlotte Pipe & Foundry Company contains no fewer than two brochures produced by the CISP Institute, three advertisements produced by the CISP Institute, and a CISP Institute "Info Kit."  *See* http://shop.charlottepipe.com/LIT/c-7-cispi-items.aspx.  The CISP Institute's "CISP Handbook" is also available on Defendants' websites. *See, e.g.,* http://www.abifoundry.com/Catalogs&Handbooks/CISPI_Handbook.pdf.

38.     The CISP Institute has seven (7) representatives whose responsibilities are divided into regions.  Together, these 7 regional representatives cover every state in the country.

-10-

39.     As the only members of the CISP Institute, the Manufacturer Defendants have had numerous opportunities to discuss pricing at CISP Institute-sponsored and organized events in Tennessee. In fact, the Manufacturer Defendants' executives and managers attend CISP Institute sponsored and organized events at least twice annually.

40.     The Manufacturer Defendants routinely use the CISP Institute in Tennessee as a mechanism to facilitate communication and coordination of their activities, including price-fixing, maintaining their market shares, and excluding foreign competition. For example, the CISP Institute's executive vice president, Mr. William H. LeVan, has communicated – in writing or by telephone – to each of the Manufacturer Defendants on numerous occasions to alert them that CISP customers were being solicited by foreign manufacturers, and has produced weekly reports to the Manufacturer Defendants to provide them information concerning bidding and pricing information. Moreover, the CISP Institute has been used to convey information between the Manufacturer Defendants about potential competitive threats posed by importers.

41.     In addition to all of the above, the CISP Institute and its Executive Vice President, Mr. LeVan, have coordinated, convened, and conducted bi-annual meetings, attended by top level executive officers of the Manufacturer Defendants, including Allan Boscatti (President and CEO of AB&I), Frank Dowd (CEO of Charlotte Pipe), Roddy Dowd (former President of Charlotte Pipe), Don Waugaman (formerly Vice President of Sales at Tyler and currently Vice President of Sales at Charlotte Pipe), Patrick Starkey (Vice President of Sales at Tyler), and Bill Bliss (Executive Vice President of Tyler), for the purpose of conceiving, effectuating, and implementing the price-fixing arrangement described herein.

-11-

42. Therefore, the CISP industry has a substantial manufacturing, marketing and sales presence in Tennessee, having its trade association here, marketing themselves through that trade association, and meeting in Tennessee to agree on prices, among other things.

43. As the CISP Institute is fully-funded the Manufacturer Defendants, overcharges paid by Plaintiff and Class members for CISP from all across the United States logically flowed back to the CISP Institute in Tennessee. Millions of dollars in revenue is generated for the Manufacturer Defendants by the utilization of the CISP Institute in Tennessee.

44. In addition, the Manufacturer Defendants and the CISP Institute, directly or through their executives, officers, or agents, engaged in the following other activities in or substantially-affecting trade and commerce in the State of Tennessee:

(a) Transacted CISP business in Tennessee;

(b) Contracted to supply CISP from Tennessee;

(c) Intentionally availed themselves of the benefits of selling CISP from Tennessee to Tennessee and other United States jurisdictions;

(d) Produced, promoted, sold, marketed, and/or distributed CISP from Tennessee; and

(e) Derived substantial revenue in Tennessee from CISP sold, purchased, and used in Tennessee and throughout the United States.

## VI. RELEVANT MARKETS

45. The relevant product market is the market for the sale of CISP for use in commercial, industrial, and multi-story residential buildings in the United States.

46. The relevant geographic market is the United States.

-12-

## VII.  FACTUAL ALLEGATIONS

## Cast Iron Soil Pipe and Fittings

47.    CISP is primarily used in buildings for sanitary and storm drain, waste, and vent piping applications.  CISP is used in residential, commercial and industrial construction.

48.    CISP has been used in the United States since the beginning of the 19th century, when it replaced wooden systems.  In the early part of the 21st century, production of CISP fluctuated with demand and periods of new construction.

49.    CISP is manufactured predominantly from cast iron.  Cast iron is a generic term that refers to a series of alloys primarily made of iron, carbon, and silicon.  Cast iron may also contain trace amounts of other materials such as manganese, sulfur, and phosphorous.

50.    Numerous state and local building codes require the use of CISP for certain types of construction.

51.    CISP has numerous characteristics that make it particularly well-suited for drain, waste, vent, and sewer plumbing applications, including resistance to corrosion and abrasion.

52.    The methods for joining CISP together in various configurations make it versatile. Additionally, it can be installed both above and below flooring, as well as underground, as the following figure demonstrates:

-13-



-14-

Figure 1 – Typical Housing CISP Pipe Layout

53.    CISP is classified into two major types — "Hub and Spigot" and "Hubless." Hubless

CISP is also called "No-Hub." The method of joining No-Hub pipe and fittings utilizes a metallic

shielded hubless coupling that telescopes over the plain ends of the pipe and fittings and is torqued

to seal the joint. Hub and Spigot pipe and fittings have "hubs" into which the spigot (plain end) of

the pipe or fitting is inserted. The joint is sealed with a rubber compression gasket or molten lead

and oakum. The following figures illustrate the two types of CISP:



Figure 2 – Traditional hub and spigot CISP.



-15-

Figure 3 – No-Hub Pipe and Hubless Coupling

54.     While No-Hub pipes come in only one standard thickness, Hub and Spigot pipe comes in a standard thickness, called service weight, and also an "extra heavy" thickness.

55.     CISP fittings include various designs and sizes, consisting of bends, tees, wyes, traps, drains, and other special fittings.  The following figure illustrates some of the different types of CISP fittings:



Figure 4 – Various CISP fittings

**The CISP Industry**

56.     The most frequent purchasers of CISP are plumbing wholesalers.  End-users of CISP include construction companies, plumbers and developers.

57.     Fifty-nine percent of the CISP produced is 3-inch and 4-inch in circumference, 25% is 1 1/2-inch and 2-inch, and 16% is 5-inch and over.

58.     Fittings constitute roughly a quarter of the total tonnage of CISP combined production.

59.     CISP is delivered to purchasers across the United States and is generally shipped directly to the job site from the manufacturer via truck.

60.     According to U.S. Census data, the annual value of CISP shipped in the U.S. between 2004 and 2011 was between $350,000,000 and $450,000,000.

-16-

## Market Characteristics Conducive to Collusion
## Limited Number of Producers

61.     There are only three producers of CISP in the United States: Charlotte Pipe; AB&I; and Tyler Pipe. Both Tyler Pipe and AB&I are divisions of McWane.

62.     McWane and Charlotte Pipe together account for over 90% of the market for CISP. The FTC has described the industry as "highly concentrated."  And the exit of Star Pipe from the market "substantially increased the level of concentration in the relevant market[]."

63.     In fact, the industry is so concentrated that in 2007 and 2009 the U.S. Census withheld reporting CISP data specifically because there was a risk that with so few producers, the release of data would enable the public to identify proprietary company information even from the aggregate data.

## High Barriers to Entry

64.     There are significant barriers to entry and expansion to new entrants to the CISP market.  First, there are substantial costs associated with either building or acquiring a foundry as well as the specialty manufacturing tools necessary to produce CISP.  For example, Star Pipe's CISP assets that were acquired by Charlotte Pipe, which constituted a very small percentage of the market overall, still sold for $19 million.

65.     Additionally, a new entrant would have to develop a distribution network and relationships with both plumbing distributors and end-users.

66.     Finally, manufacturers must be able to produce both the most commonly requested CISP, and also less common types of CISP, in order to offer a full line of CISP products to customers.

-17-

## Product Homogeneity

67. CISP is a commodity-like product, and the Manufacturer Defendants' products are produced to industry-wide standards. Because all CISP is standardized and must meet strict American Society for Testing and Materials requirements, manufacturers of CISP compete mainly on price. This product homogeneity enhanced the Manufacturer Defendants' ability to collude on prices and to detect deviations from those collusively set prices.

## Price Inelasticity

68. If a given change in price triggers a smaller proportionate change in the quantity demanded, then the demand for the good or service is said to be inelastic.

69. Demand for CISP is inelastic because there is no functional substitute for CISP. Plastic pipes, such as PVC or ABS pipe, are not a substitute for CISP because CISP has several properties that plastic pipe cannot replicate, such as:

    a.     CISP's acoustical characteristics make it more effective in reducing plumbing noise than other materials;

    b.     Unlike other materials, cast iron has high crush strength and resistance to tree roots, penetration by rodents, and failure because of ground shifts. Unlike plastic pipe, no special bedding is required to support CISP;

    c.     The thermal expansion and contraction of cast iron is far less than that of other materials, such that failures from expansion and contraction due to extreme cold and heat are virtually impossible; and

    d.     Unlike other materials, CISP is noncombustible and will not burn in the event of a building fire.

-18-

70.     Ductile Iron Pipe is not a substitute product because it comes in much larger sizes and is used mainly for large waterworks projects, whereas CISP is much smaller and is used for drain waste and vent plumbing inside residential and commercial properties.

71.     Additionally, state, municipal and local codes often require the use of CISP, as opposed to plastic piping, which means that there is no potential alternative for CISP in those areas.

### Defendants Had Many Opportunities to Collude

72.     The Manufacturer Defendants (and affiliated entities) comprise the only members of a trade association called the Cast Iron Soil Pipe Institute ("CISP Institute"). The CISP Institute was organized in 1949 by the leading American CISP manufacturers. At the time of its inception, it included 24 manufacturers. Today, it includes only the three Manufacturer Defendants—two of which are divisions of Defendant McWane—and other entities owned and controlled by them. The Manufacturer Defendants are the CISP Institute's sole source of financial support.

73.     As the only members of CISP Institute, the Manufacturer Defendants have had numerous opportunities to discuss pricing at CISP Institute events. Executives and managers from the Manufacturer Defendants attend CISP Institute events together at least twice per year.

74.     The CISP Institute is used by the Manufacturer Defendants as a mechanism to facilitate communication and coordination of their activities, including price-fixing, maintaining their market shares, and excluding foreign competition. The Executive Vice President of the CISP Institute, Bill LeVan, has communicated – in writing or by telephone – to the Manufacturer Defendants on numerous occasions for the purpose of alerting them that CISP customers were being solicited by foreign manufacturers. LeVan also has provided weekly reports to the Manufacturer Defendants that provided information concerning bidding and pricing information. In addition, the

-19-

CISP Institute has been used to communicate information directly between its members about potential competitive threats posed by importers.

75. Senior officials from Defendants have participated in bi-annual CISPI meetings to effectuate the conspiracy described herein. These meetings have included LeVan, Allan Boscatti (President and CEO of AB&I), Frank Dowd (CEO of Charlotte Pipe), Roddy Dowd (former President of Charlotte Pipe), Don Waugaman (formerly Vice President of Sales at Tyler and currently Vice President of Sales at Charlotte Pipe), Patrick Starkey (Vice President of Sales at Tyler), and Bill Bliss (Executive Vice President of Tyler). Shortly after certain of these meetings, and before any public announcement, Starkey, Bliss or Sterling Bowman (Tyler's National Sales Manager) reported to Tyler employees that Tyler would increase CISP prices and that Charlotte would do the same.

76. In addition to their coordinated activities through the CISP Institute, the Manufacturer Defendants' executives also attended annual meetings of the American Supply Association, which counts CISP manufacturers as participants. This association provided further opportunities to discuss and implement the unlawful conspiracy described herein.

77. Other trade associations, such as the American Water Works Association, held conferences and meetings, which provided additional opportunities for the Manufacturer Defendants to come together and discuss and set prices.

### The Price-Fixing Conspiracy

78. The Manufacturer Defendants – as the dominant suppliers in the market – have been fixing CISP prices since at least 2006. The Manufacturer Defendants' CISP list prices, rebates, and multipliers (which are percentages multiplied by a given list price to arrive at the respective

-20-

transaction price) have been maintained in lockstep with each other during the course of the conspiracy.

79. In 2005 or 2006, an employee in Charlotte Pipe's cast iron foundry in North Carolina learned that Charlotte Pipe and the McWane companies were fixing prices of CISP. He learned this from Charlotte's plant manager, Marshall Coble. Specifically, Mr. Coble stated, during the course of a meeting at the foundry, that the CISP manufacturers met at the bi-annual trade association meeting that Summer or Fall to discuss and agree on pricing for CISP. When the employee challenged the plant manager about the legality of such actions, the plant manager quickly brushed his concerns aside and moved on to another topic.

80. The Manufacturer Defendants often announced identical price increases very close in time to one another and soon after that trade association meeting occurred. For instance, in early September 2010, both Charlotte Pipe and AB&I announced a future price increase of 7.5% set to take effect on January 1, 2011.

81. The Manufacturer Defendants posted prices for the most common sizes of CISP, all effective the first of the year, mirror each other exactly.

82. Due to the conspiracy, the Manufacturer Defendants have been able to maintain and/or raise prices without regard to market demand. As shown in the figure below, the Manufacturer Defendants have steadily increased prices since January 1, 2006 even though construction spending – a prime determinant of CISP demand – has fallen significantly during that time. During this period, the Manufacturer Defendants raised prices more than 50% although total construction spending declined significantly.

-21-

83.     These price increases also have significantly exceeded changes in the cost of manufacturing CISP during this time period.  The primary cost determinants for CISP – including scrap iron and natural gas – have increased at rates substantially less than the price increases set forth above.

84.     In addition to the aforementioned activities, the Manufacturer Defendants also agreed to limit competition for "each other's" customers.  For example, sales representatives at Tyler were trained and directed by Patrick Starkey and Bill Bliss to stay away from Charlotte Pipe's CISP customers and maintain their current market position, rather than trying to seek business from Charlotte Pipe's customers.

**The Acquisition Of Star Pipe's Cisp Business Furthered The Conspiracy**

85.     In 2007, Star Pipe entered the CISP market.  Prior to that time, Star Pipe had produced and sold, among other things, ductile iron pipe fittings products. Star Pipe sought membership in the CISP Institute – which the Manufacturer Defendants controlled – but was not permitted to join.

86.     McWane and Charlotte Pipe had significant concerns about the potential impact of Star Pipe's entry – particularly as Star Pipe's market position strengthened over time – and the impact this entry would have on competitive conditions in the CISP market and their ability to maintain a price-fixing scheme.

87.     Star Pipe's potential growth as a competitor posed a threat to Defendants' ability to maintain their ongoing price-fixing conspiracy.  Just as the Manufacturer Defendants had, through their participation and control of CISPI, taken coordinated steps to exclude competition by importers, actions were taken to foreclose competition by Star Pipe.  Specifically, in 2010, Charlotte Pipe

commenced steps to eliminate Star Pipe as a competitor in the CISP market and to maintain the Manufacturer Defendants' price-fixing conspiracy. Charlotte Pipe's anti-competitive actions were in furtherance of the conspiracy because they eliminated the potential threat to the conspiracy presented by Star Pipe.

88.     On July 14, 2010, Charlotte Pipe executed a confidential Asset Purchase Agreement with Star Pipe, which allowed Charlotte Pipe to acquire the entirety of Star Pipe's CISP business, including Star Pipe's CISP inventory, production equipment, business records and customer lists. Charlotte Pipe paid approximately $19 million for the Star Pipe CISP assets. Shortly after acquiring the Star Pipe assets, Charlotte Pipe had all such equipment destroyed.

89.     The parties also signed an agreement that prohibited Star Pipe and certain Star Pipe employees from competing with Charlotte Pipe in North America for six years after the date the agreement was signed. And Star Pipe agreed to send a letter to its customer list stating that it had decided to exit the CISP business.

90.     Several Star Pipe executives received large cash bonuses following the completion of the sale of the CISP business to Charlotte Pipe.

91.     The Star Pipe acquisition was not the only CISP business that Charlotte Pipe had purchased in recent history. According to the FTC Complaint, Charlotte Pipe acquired the CISP assets of other potential competitors, including Matco-Norca in 2009. If a small CISP company posed a risk of stimulating price competition in the CISP market, Charlotte Pipe has purchased the company in order to shut down production and destroy any CISP assets. The elimination of these competitors, like the activities coordinated through CISPI, has facilitated Defendants' ability to maintain and enforce their price-fixing conspiracy.

-23-

92.     In 2013, the FTC challenged the acquisition, alleging that Charlotte Pipe had violated Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45.  The FTC issues such complaints when it has "reason to believe that the law has been or is being violated, and it appears to the Commission that a proceeding is in the public interest."

93.     The FTC subsequently entered into a consent agreement with Charlotte Pipe to "address the anticompetitive effects resulting from Charlotte Pipe's 2010 acquisition of the cast iron soil pipe business of Star Pipe."

94.     The consent agreement mandated that for the ten years following its execution, Charlotte Pipe must notify the FTC before acquiring any additional entities engaged in the manufacture or sale of CISP products in order for the FTC to "guard against future anticompetitive transactions."  It further mandated that Charlotte Pipe inform its customers and the public of the acquisition of Star Pipe, as well as its previous CISP acquisitions.  It also invalidated the non-compete and confidentiality clauses contained in the Star Asset Purchase Agreement.

## VIII.   FRAUDULENT CONCEALMENT

95.     Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until on or about April 2, 2013, when the FTC's redacted complaint was filed.

96.     Because Defendants' alleged conspiracy was kept secret until April 2, 2013, before that time, Plaintiff and members of the Class were unaware of Defendants' unlawful conduct alleged herein, and they did not know before that time that they were paying supra-competitive prices for CISP throughout the United States during the Class Period.

-24-

97.     The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

98.     Defendants' conspiracy was inherently self-concealing.  Cast iron soil pipe and fittings are not exempt from antitrust regulation, and thus, before April 2, 2013, Plaintiff had no reason not to consider it to be a well-regulated, competitive industry.

99.     In the context of the circumstances surrounding the Manufacturer Defendants' pricing practices, their acts of concealment were more than sufficient to preclude suspicion by a reasonable person that the pricing was conspiratorial.  Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' proffered CISP prices before April 2, 2013.

100.     Plaintiff and members of the Class could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of and fraudulently conceal their conspiracy.

101.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiff and members of the Class had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until on or about April 2, 2013, when the FTC complaint, and its corresponding factual allegations of anti-competitive conduct concerning the CISP industry, was first publicly disseminated.

102.     None of the facts or information available to Plaintiff and members of the Class prior to April 2, 2013, if investigated with reasonable diligence, could or would have led to the discovery

-25-

of the conspiracy alleged herein prior to that date. Without the benefit of discovery, it is impossible to determine the scope and extent of Defendants' and their co-conspirators' (nonpublic) meetings and communications with each other. Defendants are alleged to have engaged in a secret conspiracy that necessarily did not give rise to facts that would put Plaintiff or the Class on inquiry notice that there was a conspiracy to fix prices for CISP. The conspiracy as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, communications and agreements. If they were memorialized in records at all, Defendants' contacts and meetings with each other were memorialized in a false and/or misleading manner in order to conceal the anticompetitive topics of discussion. Defendants' contacts and meetings with each other were also concealed from Defendants' customers and other non-conspirators.

103.    Although the Manufacturer Defendants' price increase announcements, including in the form of new price lists, during the Class Period sometimes did not contain justifications for price increases, the announcements and price lists nevertheless constituted implicit statements that price increases were legitimate and were the result of competitive market forces.

104.    For example, Defendants acted in furtherance of the conspiracy, and helped conceal the conspiracy, through communications such as the following:

> ■ In May 2007, AB&I told customers that "[i]t is ABI's policy to give the market as much notice as possible regarding a price increase, since contractors and others need to plan their jobs so far in advance." This statement was misleading because advance notice of price increases was also important to ensure that the conspirators would adhere to their price-fixing agreement and implement price increases on the same date.

■ In March 2008, AB&I falsely told customers that its price increase was "simply a cost pass-through" because earlier increases were insufficient to cover the rise in scrap iron prices. AB&I indicated that "it has become necessary to increase prices to recover these added costs of production." AB&I indicated that future price increases might be necessary to cover cost changes.

■ In November 2009, AB&I falsely told customers that it was increasing prices after trying "to put off this price increase for as long as we could." AB&I represented that "[a]s in all price increases, this one came after weeks of deliberation. The disturbance such increases can cause to our valued customers is a regrettable effect, but this effect must be weighed against the impacts of NOT raising prices to stay in line with costs." ABI told customers that the "scrap iron market is a small subset of the ferrous metals market, and AB&I's scrap iron costs are inextricably linked to world steel demand. Any growth in world steel demand produces upward pressure on scrap iron prices. World demand for steel has steadily increased since April 2009, according to the World Steel Association. In fact, China produced more steel in August, 2009 than in any other month in its history. Despite falling demand in U.S. commercial construction, AB&I is experiencing rising raw material costs."

■ On September 1, 2010, Charlotte Pipe falsely told customers that price increases were the result of cost increases in raw materials and operating expenses and that as a result of cost increases, prices would remain at higher levels through 2011.

■ In September 2010, AB&I falsely told customers that because of raw material cost increases it was announcing a commensurate increase in CISP prices.

■ On September 7, 2011, Charlotte Pipe announced price increases and falsely attributed these increases to cost increases in scrap iron and other major raw materials.

■ On September 20, 2011, Charlotte Pipe falsely told customers that it was increasing prices "[d]ue to cost increases in scrap iron and other major raw materials as well as increases in general operating expenses."

105.    The Manufacturer Defendants' statements justifying their price increases throughout the Class Period were designed to create, and did create the impression that these increases were based on competitive market forces.  These statements were false and misleading, and constituted affirmative and overt acts of concealment of the conspiracy, because the Manufacturer Defendants' price increases were a result of the affirmatively and fraudulently concealed conspiracy set forth herein.  Customers were never alerted to Defendants' secret meetings, agreements and cooperation with each other, as set forth above.

106.    Defendants and their co-conspirators engaged in a successful anti-competitive conspiracy concerning CISP, which they affirmatively concealed, at least in the following respects:

   a.    By communicating secretly to discuss customers and prices of CISP in the United States;

   b.    By meeting at trade association meetings to discuss and fix prices;

   c.    By issuing or justifying price increase announcements based on false and/or misleading reasons, including cost increases; and

   d.    By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme.

107.    As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting Plaintiff's and the claims of the Class have been tolled.

## IX.  VIOLATIONS OF THE ANTITRUST LAWS

108.    Beginning by at least January 1, 2006 and continuing through the present, Defendants have engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize the prices of CISP in the United States.

-28-

109.     Defendants engaged in anti-competitive activities, the purpose and effect of which were to artificially raise, fix, maintain, or stabilize the price of CISP sold in the United States.  These activities included:

> a.     participation in meetings, conversations, and communications to discuss the price and pricing terms for the sale of CISP in the United States;
>
> b.     agreeing during those meetings, conversations, and communications to charge prices at specified levels, to allocate customers, and to otherwise fix, raise, maintain, or stabilize prices of CISP sold in the United States; and
>
> c.     taking numerous steps, as set forth above, to implement and maintain the conspiracy.

110.     Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

111.     Charlotte Pipe's acquisition of Star Pipe's CISP business resulted in decreased market competition and increased concentration in the market for CISP.

112.     Throughout the Class Period, Plaintiff and the other Class members purchased CISP from Defendants (or their subsidiaries or controlled affiliates) at supra-competitive prices.

## X.  ANTI-COMPETITIVE EFFECTS

113.     As a result of Defendants' unlawful conduct, Plaintiff and the other Class members have been injured in their business and property because they have paid more for CISP than they would have paid absent collusion.

114.     Defendants' unlawful contract, combination, or conspiracy has had at least the following effects:

-29-

      a.      price competition in the market for CISP has been artificially restrained;

      b.      prices for CISP sold by Defendants have been raised, fixed, maintained, or stabilized at supra-competitive levels; and

      c.      purchasers of CISP from Defendants have been deprived of the benefit of free and open competition in the market for CISP.

## XI. CLASS ALLEGATIONS

115.    Plaintiff brings this action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") consisting of:

> All persons or entities that purchased cast iron soil pipes or cast iron soil pipe fittings in the United States indirectly from any of the Defendants, their subsidiaries, predecessors, or affiliates, from January 1, 2006 through the present (the "Class Period").

> Excluded from the Class are Defendants, their parent companies, subsidiaries, predecessors, and affiliates, any co-conspirators, federal and state governmental entities and instrumentalities of federal and state governments.

116.    Alternatively, Plaintiff brings this action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Tennessee Class") consisting of:

> All persons or entities that purchased cast iron soil pipes or cast iron soil pipe fittings in the State of Tennessee indirectly from any of the Defendants, their subsidiaries, predecessors, or affiliates, from January 1, 2006 through the present (the "Class Period").

117.    Plaintiff does not know the exact size of either Class, but based on the nature of the trade and commerce involved, Plaintiff believes that both Class numbers at least in the thousands and that the members are geographically dispersed throughout Tennessee and the United States. Therefore, joinder of the members of the Class would be impracticable.

118.    Common questions of law and fact exist as to all members of the Class.  This is particularly true given the nature of Defendants' and their co-conspirators' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole.  Such questions of law and fact common to the Classes include, but are not limited to:

(a) Whether the Defendants and their co-conspirators engaged in an arrangement, contract, agreement, trust, combination or conspiracy among themselves which lessened or tended to lessen full and free competition in the market for CISP and/or to fix, raise, maintain or stabilize the prices of CISP sold in Tennessee and the United States;

(b)  The identity of the participants of the alleged arrangement, contract, agreement, trust, combination, or conspiracy;

(c) The duration of the alleged arrangement, contract, agreement, trust, combination, or conspiracy and the acts carried out by the Defendants and their co-conspirators in furtherance of the conspiracy;

(d) Whether the alleged arrangement, contract, agreement, trust, combination, or conspiracy violated the Tennessee Trade Practices Act, Tenn. Code Ann. § 47-25-101 et seq.;

(e) Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Class;

(f) The effect of the alleged conspiracy on the prices of CISP sold in Tennessee and the United States during the Class Period;

(g) Whether Plaintiff and the members of the Class had any reason to know or suspect the conspiracy, or any means to discover the conspiracy;

(h) Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiff and the members of the Class;

(i) The appropriate injunctive and related equitable relief;

(j) The appropriate class-wide measure of damages; and

(k) Whether Charlotte Pipe's acquisition of Star Pipe's CISP assets substantially increased concentration or decreased competition in the market for CISP, or was undertaken as a method of ensuring the continuing success of the Defendants' price-fixing conspiracy by eliminating a competitor from the market.

119.    Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all members of the Class are similarly affected by Defendants' wrongful conduct in that they paid artificially-inflated prices for CISP purchased indirectly from the  Defendants and/or their co-conspirators.  Accordingly, by proving their own claims, Plaintiff will presumptively prove Class members' claims.

120.    Plaintiff can and will fairly and adequately represent and protect the Class members' interests and has no interests that conflict with or are antagonistic to Class members' interests. Plaintiff's attorneys are experienced and competent in complex class action and antitrust litigation.

121.    The questions of law and fact common to the members of the Class, as identified above, predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

122.    A class action is the superior procedural vehicle for the fair and efficient adjudication of the claims asserted given that:

(a) Enormous economies to the court and parties exist in litigating the common issues on a class-wide basis;

(b) Each individual Class member's damage claim is too small to make individual litigation an economically viable alternative, and few class members have any interest in individually controlling the prosecution of separate actions;

-32-

(c) Class treatment is required for optimal deterrence and compensation and for limiting the court-awarded reasonable legal expenses incurred by class members; and

(d) Despite the relatively small size of each individual class member's claim, the aggregate volume of their claims – coupled with the economies of scale inherent in litigating similar claims on a common basis – will enable this case to be litigated as a class action on a cost effective basis, especially when compared with repetitive individual litigation, and no unusual difficulties are likely to be encountered in this class action's management in that all legal and factual questions are common to the Classes.

123.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

124.    Adjudicating the claims of the Class members as a class action is superior to the alternative, because it allows for the fair and efficient adjudication of the controversy alleged in Complaint, while avoiding the risk that the prosecution of separate actions by individual members of the Class would create inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.  This action presents no difficulties in management that would preclude its maintenance as a class action.

## XII.   CLAIMS FOR RELIEF

### COUNT ONE

**Violation of the Tennessee Trade Practices Act,
Tenn. Code Ann. §§ 47-25-101 et seq.**

125.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

126.    The Tennessee Trade Practices Act ("TTPA"), Tennessee Code Annotated § 47-25-101, provides:

-33-

All arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of articles imported into this state, or in the manufacture or sale of articles of domestic growth or of domestic raw material, and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, are declared to be against public policy, unlawful, and void.

127.     Tennessee law also allows any person injured indirectly, like the Plaintiff and Class members, to seek redress for their injuries arising out of illegal arrangements. Tenn. Code Ann. § 47-25-106 provides:

Any person who is injured or damaged by any such arrangement, contract, agreement, trust, or combination described in this part may sue for and recover, in any court of competent jurisdiction, from any person operating such trust or combination the full consideration or sum paid by the person for any goods, wares, merchandise, or articles, the sale of which is controlled by such combination or trust.

128.     In *Freeman Indus., LLC v. Eastman Chemical Co.,* the Tennessee Supreme Court ruled that the TTPA was triggered not by anti-competitive conduct but by "the effect of the anti-competitive conduct." The Supreme Court also held that the TTPA's applicability, whether invoked by Tennessee residents *or* non-residents, should be judged by "whether the alleged anti-competitive conduct affects Tennessee trade or commerce to a substantial degree." *Id.*

129.     During the Class Period, Defendants' illegal conduct substantially affected Tennessee trade and commerce and caused injury to consumers in Tennessee.

-34-

130.     Defendants and unnamed co-conspirators entered into and engaged in an agreement, contract, arrangement, combination or conspiracy which lessened or tended to lessen full and free competition in the market for CISP in violation of the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101 et seq.

131.     The acts done by Defendants as part of, and in furtherance of, their and their co-conspirators' agreement, contract, arrangement, combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

132.     The anti-competitive acts were intentionally directed at the Tennessee market for CISP and had a substantial and foreseeable effect on Tennessee trade and commerce.

133.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

> (a) Participating in meetings and conversations among themselves in Tennessee during which they agreed to price CISP at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiff and Class members with respect to CISP sold in the United States; and

> (b) Participating in meetings and conversations among themselves in Tennessee to implement, adhere to, and police the unlawful agreements they reached.

134.     Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate customers with respect to CISP.

-35-

135.    Defendants' anti-competitive acts described above were knowing and willful  and constitute violations or flagrant violations of the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, et seq.

136.    The conspiratorial acts have caused unreasonable restraints in the market for CISP.

137.    Defendants' arrangements, contracts, agreements, trusts, combinations, or conspiracy to fix, raise, maintain, or stabilize the prices of CISP marketed, distributed, or sold in Tennessee and the United States had the following substantial effects on Tennessee commerce:

> (a) The prices of CISP indirectly purchased by Class members were fixed, raised, maintained, and stabilized at inflated, artificial and non-competitive levels;
>
> (b) Class members were deprived of free and open competition in the purchase of CISP;
>
> (c) Competition in the sale of CISP was restrained; and
>
> (d) Class members paid higher prices for CISP than they would have paid absent Defendants' arrangement.

138.    During the Class Period, Class members indirectly purchased millions of dollars worth of Defendants' CISP in Tennessee and elsewhere.  By reason of Defendants' violations of the TTPA, Plaintiff and Class members paid significantly more for CISP than they would have paid absent Defendants' illegal arrangement, and, as a result, Plaintiff and Class members were injured in their businesses and property and have suffered damages in amounts presently undetermined.

139.    Defendants' arrangements, contracts, agreements, trusts, combinations, conspiracy further substantially affected Tennessee commerce because one or more of the Defendants, either directly or through their agents, engaged in the following activities in or affecting commerce in Tennessee:

-36-

(a) Transacted CISP business in Tennessee;

(b) Contracted to supply or obtain goods or revenue related to the CISP business in Tennessee;

(c) Intentionally availed themselves of the benefits of doing CISP business in Tennessee;

(d) Produced, promoted, sold, marketed, and/or distributed CISP in Tennessee, thereby purposefully profiting from access to Tennessee's CISP market;

(e) Caused tortious damage in Tennessee by fixing CISP prices;

(f) Caused tortious damage in Tennessee by acts or omissions committed outside Tennessee by regularly doing or soliciting business in Tennessee; engaging in other persistent courses of conduct within Tennessee; and/or deriving substantial revenue from goods used or consumed or services rendered in Tennessee; and

(g) Committed acts and omissions that they knew or should have known would cause damage (and, in fact, did cause damage) in Tennessee while regularly doing or soliciting business in Tennessee; engaging in other persistent courses of conduct in Tennessee; and/or deriving substantial revenue from goods used or consumed or services rendered in Tennessee.

140. During the Class Period, Defendants' arrangement substantially affected Tennessee commerce in the following additional ways:

(a) ***The Arrangement's Substantial Effect on Tennesseans' Trade or Commerce:*** Some price-fixing arrangements only affect the commerce of a limited geographic region or a limited number of residents. Defendants' arrangement, however, was more far reaching – it substantially affected thousands of Tennessee residents. Because CISP are routinely integrated into residences and commercial buildings, CISP was purchased by thousands of people in Tennessee who purchased a home or building during the Class Period, by

-37-

virtually all segments of society, and in all geographic regions. There could hardly be anti-competitive conduct with a more substantial effect on the commerce of Tennessee and Tennesseans than Defendants' illegal conduct alleged here.

(b)     ***The Substantial Monetary Effect on Tennessee Trade or Commerce:*** Defendants' arrangement lasted from and including January 1, 2006 through such time as the anti-competitive effects of Defendants' conduct ceased (the "Class Period"), and over that time, they sold millions of dollars worth of CISP in Tennessee and the United States. With even a modest estimated overcharge during that time, Defendants illegally profited by millions of dollars from their arrangement. The arrangement's adverse effect on Tennessee commerce was at least millions of dollars. Furthermore, the substantial monetary effect on Tennessee is more than to just consumers/indirect purchasers due to lost sales to Tennessee direct purchasers because of Defendants' illegal prices.

(c)     ***Substantially Harmful Effect on the Integrity of the Tennessee Market:*** The Tennessee market is vulnerable and can be manipulated by companies either from outside Tennessee, inside Tennessee, or both. Without enforcing Tennessee's antitrust law to its fullest extent, as expressed by the Tennessee Supreme Court, companies that break the law will remain unpunished, and they will remain able to prey upon Tennesseans without consequence. The Tennessee Supreme Court explained that "the purpose of the TTPA is to protect the state's trade and commerce affected by anticompetitive conduct." Defendants have shattered this very purpose by illegally and criminally victimizing the Tennessee market. Thus, every level of the Tennessee market's integrity has been compromised – from the manufacturer to the middleman to the consumer.

(d)    ***The Substantial Adverse Effect on Tennessee Commerce was Critical to the Criminal Arrangement's Success:*** Because CISP is sold throughout the United States, price arbitrage between states would prevent Defendants' arrangement's effectiveness if their arrangement did not affect every one of these states, including Tennessee. Thus, to ensure their arrangement's effectiveness, Defendants knew that Tennessee commerce had to be, would be, and was substantially affected in order to carry their arrangement out.

(e)    ***Length of Substantial Effect on Tennessee Commerce:*** Some arrangements are short-lived. This one lasted for a dozen years, during which time Defendants profited from it, thereby permitting them to continue their victimization of Tennessee consumers and have a substantial effect on Tennessee commerce.

141.    Defendants' price-fixing arrangement was perpetrated against and substantially affected Tennessee commerce by having victimized Tennesseans and/or by having occurred in Tennessee. The results of Defendants' actions occurring outside Tennessee also substantially affected Tennessee commerce by increasing the prices Tennesseans paid for Defendants' price-fixed CISP. As the result of Defendants' illegal actions' substantial effect on Tennessee commerce, indirect purchasers of Defendants' CISP have been injured.

142.    As a direct and proximate result of Defendants' TTPA violations, Plaintiff and Class members have suffered injuries and seek damages in an amount necessary to restore them to the position they would have been in had Defendants not violated the TTPA.

143.    Plaintiff and Class members have been injured in their business and property by paying more for CISP purchased indirectly from Defendants and their co-conspirators than they would have paid and will pay absent the conspiracy.

-39-

144.    The alleged agreement, contract, arrangement, combination or conspiracy is a *per se* violation of the Tennessee Trade Practices Act.

145.    Plaintiff and Class members are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**COUNT II**

**Unjust Enrichment**

146.    Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this complaint.

147.    Defendants have benefitted from its unlawful acts through the overpayments for by Plaintiff and the other Class members and the increased profits resulting from such overpayments. It would be inequitable for Defendants to be permitted to retain the benefit of these overpayments that were conferred by Plaintiff and the Class and retained by Defendants.

148.    By reason of its unlawful conduct, Defendants should make restitution to Plaintiff and the Class.   To the extent Plaintiff is required to have exhausted administrative remedies before bringing an unjust enrichment claim, exhaustion of any such remedies is not required in this instance because: (a) the issues are of the type that would be appropriate for judicial determination, and (b) applying the doctrine here would result in substantial financial hardship, inequity and economic inefficiency and would violate public policy.   Further, any action which might have been taken by Plaintiff to pursue administrative remedies would have been futile.

149.    In equity, Defendants should not be allowed to retain the economic benefit derived from said improper conduct and should be ordered to pay restitution and pre-judgment interest to Plaintiff and Class members.

-40-

### XIII.  DEMAND FOR JURY TRIAL

150.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

### XIV.   PRAYER FOR RELIEF

Plaintiff requests:

A.    That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.    That the Court determine that the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

1.    A violation of Tennessee Code Ann. § 47-25-101 et seq.;

2.    A per se violation of the Tennessee Trade Practices Act; and

3.    An unlawful agreement, contract, arrangement, trust, combination or conspiracy in violation of the Tennessee Trade Practices Act, as set forth herein;

C.    That Plaintiff and the Class members recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiff and members of the Class be entered against the Defendants;

D.    That Plaintiff and Class members recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.    That Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on

-41-

their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, agreement, arrangement, contract, conspiracy, trust, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.      That Plaintiff and Class members be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G.      That Plaintiff and Class members recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

H.      That Plaintiff and Class members have such other and further relief as the case may require and the Court may deem just and proper.

Respectfully submitted, this 25th day of November, 2013.

/s/ Gordon Ball
Gordon Ball
TN BPR#001135
**Law Offices of Gordon Ball**
7001 Old Kent Drive
Knoxville, TN 37919
Tel: (865) 525-7028
Fax: (865) 525-4679
Email: gball@gordonball.com

John Mark Griffin
**Griffin & Warren, P.C.**
The Dome Building
736 Georgia Avenue, 6th Floor
Chattanooga, TN 37402
Tel: (423) 265-4878

-42-